IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

MICHAEL BIGELOW,

                       Plaintiff,                    Case No. 3:01 CV 7626

      -vs-

                                                MEMORANDUM   OPINION

JAMES S. HAVILAND, Warden,

                       Defendant.

KATZ, J.

This matter is before this Court on the Report and Recommendation of the Federal Magistrate (Doc. 91) (hereinafter "R & R") denying habeas corpus, Michael Bigelow's ("Bigelow" or "Petitioner") objections to the R & R (Doc. 98), and Warden James Haviland's ("the state") response to Petitioner's objections.

This Court reviews Reports and Recommendations of the Magistrate de novo. The R & R comes to a conclusion in this case that is different from that anticipated by the Sixth Circuit upon its review of the ineffective assistance of counsel claim. In reviewing the R & R, this Court takes note that the Magistrate was in the best position to judge the credibility of the witnesses in person at the federal evidentiary hearing, but that the Sixth Circuit has set specific requirements that guide this Court's evaluation of Petitioner's claim. For the reasons enumerated herein, this Court hereby GRANTS Petitioner's writ of habeas corpus, giving the State of Ohio one hundred and twenty (120) days in which to retry Bigelow or release him from state custody.

**I. Background**

As did the R & R, this Court adopts the factual background of this case as set forth by the

Sixth Circuit.

On the morning of June 17, 1993, Charlotte Schrier [("Schrier")], a real estate agent, was sitting in her car behind an apartment complex in Toledo, Ohio, waiting for her next appointment. At some point she felt a tap on her left shoulder, and she heard a man's voice telling her not to move as he entered the back seat of her car. Although she could detect his presence in the back seat, she obeyed his commands to face forward and not turn around.

At some point, the man instructed her to start the car and proceed out of the complex. After Schrier drove a short distance, he asked her to pull over and light his cigarette. Schrier did as asked, then resumed driving. While she was driving, the man threatened her multiple times, saying he wanted to injure her physically and see her bleed.

At some point, the attacker asked Schrier to pull over again. This time, he got out of the car, opened her door, and pulled her out by the hair. He first instructed her to lean into the back seat, but then told her to get up again. Schrier stood up and faced the car, with the attacker behind and to her right. His hand suddenly swung down in front of her face, and she noticed that he was holding a razor blade. Pressing the blade into her hand, he told her that he wanted her to cut her own arm. When she hesitated, his arm swung again and he either cut or forced Charlotte to cut her arm with the blade. She then turned around to face him, kicked him in the groin and managed to escape. After Schrier fled, the assailant apparently set her car on fire.

Schrier gave a statement about the attack to Detective Kulakoski on the day after the incident. She described her attacker's clothing – white T-shirt, brown pants and tennis shoes – and his physical appearance-white male, late 30's to early 40's, 5'9" or 5'10", no facial hair or visible tattoos and a very close, almost Marine-like haircut. JA 654. After giving this statement, Schrier looked through photograph arrays and did so again on several other occasions, but she never recognized any of the men as her attacker. JA 611.  An initial attempt by police to create a composite sketch of the assailant failed to produce a passable likeness. A police artist later attempted a free-hand drawing of the man based on Schrier's input, the end result of which looked much like her attacker, Schrier concluded, prompting police to distribute copies of the sketch to patrol officers and to local media on July 8, 1993.

The next day, police brought Bigelow in for questioning based on his resemblance to the man in the drawing. They photographed him, and included his picture in a photo array shown to Schrier. She pointed out Bigelow's photo to Detective Kulakoski but noted that she did not remember the deep lines in his face and could not be certain that this was her attacker unless she saw him in person. Several hours

later, Schrier identified Bigelow in a line-up, and he was detained. Bigelow maintained his innocence and rejected a plea offer that included a five-year prison sentence. His case proceeded to trial five months later.

At trial, the State presented Charlotte Schrier's testimony, as well as the testimony of Thomas Mermer [("Mermer")]. Mermer had been near the scene of the incident and had radioed for help. After doing so, he noticed a man running into the field behind Schrier's burning car. Mermer testified that he could see the man only from the side and behind, JA 628; unlike Schrier, the police never showed Mermer any photo arrays or asked him to attend a line-up. Two weeks before trial, however, Mermer saw Bigelow giving an interview on television and identified him as the man he saw running into the field on the day of the crime. JA 629-30. The State did not introduce any other evidence connecting Bigelow to the crime.

The defense claimed that Bigelow was in Columbus, Ohio, 150 miles southeast of Toledo, on June 17, 1993, the day of the attack. In support of this alibi defense, it relied on two witnesses. John Laughner, the Columbus branch manager of Orkin Pest Control, testified that his office records showed that Vernon Greenlee [("Greenlee")], an employee of Orkin, had worked at the Columbus home of Gary [Chasin ("Chasin")] over a period of two days, including from 11:00 a.m. to 5:00 p.m. on June 17th. JA 677. Greenlee also testified, and he confirmed that he treated the [Chasin] home for termites on the 17th. JA 684. He testified that a man had helped him move some objects from the garage so he could perform the treatment, and that the man was present when Greenlee arrived and when he left. JA 687. Greenlee identified Bigelow in court as the man who helped him in the garage on June 17th. JA 690-91. His testimony also acknowledged, however, that he had failed to identify Bigelow's photograph in an array shown to him by police, that he had worked at the [Chasin] home over two consecutive days, not just on the date of the crime, and that he had performed between fifty and one hundred jobs since June 17th of that year. Bigelow did not testify.

[A state-court jury convicted Bigelow of kidnapping, felonious assault, and arson,] and the trial court sentenced him to consecutive prison terms, which together created a twenty to forty-two year prison term. Bigelow unsuccessfully appealed his conviction. He then filed a petition for state post-conviction relief claiming he had received ineffective assistance of trial counsel because his court-appointed lawyer had not adequately investigated his alibi defense. The state trial court denied Bigelow's petition, but the appeals court remanded for an evidentiary hearing. After hearing testimony from the three alibi witnesses whom Bigelow claimed his attorney should have identified before trial, the court again denied his petition, the appeals court affirmed, and the state supreme court denied review. Bigelow filed this suit for a writ of habeas corpus in federal district court, again claiming ineffective assistance of counsel in violation of his Sixth (and Fourteenth) Amendment rights.

3

*Bigelow v. Williams*, 367 F.3d 562, 566-68 (6th Cir. 2004).

> From his initial arrest to the present, Bigelow has insisted that he did not commit the crime and indeed could not have committed the crime because he was residing and working 150 miles away in Columbus, Ohio on the day of the assault. At each stage in the proceedings – in state court, in his state post-conviction proceedings, and now in his federal habeas corpus proceedings – Bigelow also has claimed that his court-appointed lawyer, Peter Rost [("Rost")], did not adequately investigate this alibi defense, most notably by failing to identify three witnesses who could have placed Bigelow in Columbus on the day of the assault.

*Id.* at 564.

The witnesses were employees of Moonlighting Landscape ("Moonlighting"), a contractor that was performing work at the Chasin residence on June 16-18, 1993.  They were co-owners Christine Ceresna-Patridge ("Patridge") and Victor Timler ("Timler"), and employee Jay Loyzelle ("Loyzelle") (collectively "the Moonlighting witnesses").

> In one sense, it is easier to sympathize with Rost than with Bigelow when it comes to this claim. Bigelow lived an itinerant life in Columbus; he did not remember exactly where he was in Columbus on the day of the crime; he did not fully communicate all possible leads to Rost and apparently did not inform him about his own letter-writing investigation efforts from prison; and Rost in fact did pursue many leads, none of which bore fruit. Until four days before Bigelow's trial, it is indeed difficult to second-guess Rost's efforts, frustrating as they were, to advance his client's defense.
>
> On the fourth day before the commencement of the criminal trial, however, Vernon Greenlee, an employee of Orkin Pest Control, called Rost and told him that he could place Bigelow in Columbus on the day of the crime. (Greenlee's call was prompted by a letter that Bigelow had written to Orkin from prison.) Realizing the significance of this testimony, Rost subpoenaed Greenlee and one other Orkin employee to testify at the trial. The testimony was helpful because Greenlee identified Bigelow in court as the man he saw at the home of Gary [Chasin] in Columbus on June 17th, the day of the assault, but the testimony was vulnerable to impeachment because Greenlee worked at the house at issue on two consecutive days. In convicting Bigelow, the jury apparently was swayed by the two primary pieces of evidence submitted by the State-the testimony of the victim who was able to pick Bigelow out of a lineup (and identify him at trial) based on brief glances at

4

him during the assault and the testimony of an individual who claimed to see Bigelow (from the back and side) running across a field away from the crime scene.

*Id.*

The Court further adopts the "Procedural Background" as set forth in the R & R at 4-5, and

adds that the question is now before this Court for de novo review of the R & R pursuant to *Hill v.*

*Duriron Co.*, 656 F.2d 1208 (6th Cir. 1981) and 28 U.S.C. § 636(b)(1)(B) & (C).

## II. Discussion

When a state court has already adjudicated a federal constitutional claim, [the Antiterrorism and Effective Death Penalty Act, Pub.L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA")] establishes that the writ of habeas corpus may issue in just two instances: (1) if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) if the state court decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2).

To succeed on an ineffective assistance of counsel claim, a petitioner must show (1) that his lawyer's performance was deficient and (2) that the deficiency prejudiced the defense. [*Strickland v. Washington*, 466 U.S. 668, 687 (1984).]  In establishing the first requirement, the petitioner must demonstrate that his lawyer's performance "fell below an objective standard of reasonableness" as measured by "prevailing professional norms." *Id.* at 687-88 . . . . Judicial review of the lawyer's performance must be "highly deferential," and "indulge a strong presumption" that a lawyer's conduct in discharging his duties "falls within the wide range of reasonable professional assistance," since reasonable lawyers may disagree on the appropriate strategy for defending a client. *Id.* at 689 . . . . While "strategic choices made after thorough investigation of law and facts . . . are virtually unchallengeable[,][ ] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 690-91 . . . ; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir.1994) ("[A] failure to investigate, especially as to key evidence, must be supported by a reasoned and deliberate determination that investigation was not warranted."); *cf.* ABA Standards for Criminal Justice 4-4.1(a) (3d ed. 1993) ("Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.").

5

> In establishing prejudice, Bigelow must demonstrate a "reasonable probability" that the result of his trial would have been different but for Rost's mistakes. *Strickland*, 466 U.S. at 694 . . . .  A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome," *id*., but something less than a showing that the outcome more likely than not would have been different, *id.* at 693 . . . .  While the petitioner need not conclusively demonstrate his "actual innocence," compare [*Schlup v. Delo*, 513 U.S. 298, 327 (1995)] (requiring petitioner to establish more likely than not that a reasonable juror would not have convicted him), with [*Strickland*, 466 U.S. at 693] ("we believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"), the focus should be on whether the result of the trial was "fundamentally unfair or unreliable," [*Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)].

*Bigelow*, 367 F.3d at 569-570.

The Sixth Circuit left two questions open for this Court to consider: "(1) Was it objectively unreasonable for Rost to fail to conduct further investigation after learning of the Orkin employees?; and (2) If Rost's representation was ineffective, was it likely the three alibi witnesses would have been identified had he conducted a reasonable investigation?" *Id*. at 675.  In the event that the district court were to answer these questions in the affirmative, as this Court does, the Circuit also directed the district court to address the second prong of *Strickland*, whether prejudice resulted from counsel's unreasonable representation.  This Court will view the more recent evidentiary developments in this case in light of the detailed guidance provided by the Circuit with regard to these questions.

**A. Objective unreasonableness and likelihood of identifying witnesses**

Precedent in this Circuit clearly demonstrates that a counsel's refusal to investigate a legitimate alibi witness, even one learned of late in the stages of the case, can qualify as objectively unreasonable.  *See Bigelow*, 367 F.3d at 574.  "[T]he late arrival of the Greenlee evidence [does not] necessarily excuse Rost's failure to act."  *Id.* at 574 citing *Bryant v. Scott*, 38 F.3d 1411, 1417 (5th Cir. 1994) (counsel learned of alibi witness about seventy-two hours before

6

trial, and court noted that even with just one day warning, counsel "should have contacted the witnesses and made his record to trial court as to the significance of the alibi and the fact that it was newly discovered").

In this case, Greenlee's testimony emerged as surprise evidence that could, for the first time, establish a plausible alibi defense for Bigelow. *Bigelow*, 367 F.3d at 572-573. "At a minimum, it would seem that this evidentiary breakthrough would have prompted additional inquiry either by Rost or by a publicly-funded investigator." *Id.* at 572.

The state argues that Rost's decision was a strategic one because he had followed previous leads from Bigelow (before learning about Greenlee), and those leads had failed to establish an alibi. However, that explanation is not relevant to whether the omission of investigating Greenlee was itself strategic. *Id.* at 573. "Rost's failure to do anything at this point remains unexplained, if not inexplicable." *Id.* No new evidence arose at the evidentiary hearing to alleviate the "reasonable investigation" concerns that the Sixth Circuit raised. The state admits that its basis for arguing that the decision not to investigate was reasonable – the testimony of Greenlee that he remembered seeing only two other workers at the Chasin residence – was unaltered by Greenlee's testimony at the federal evidentiary hearing. Resp. Br. at 6.

The state also argues that the Circuit indicated that, if it were established that Rost had discussed the Orkin witnesses with Bigelow, then his decision not to investigate further would be reasonable. At the federal evidentiary hearing, Rost testified that he did in fact discuss Orkin with Bigelow before the trial and that Bigelow did not mention Moonlighting. However, the Sixth Circuit was not saying that it would be satisfied merely to learn that a discussion took place. That discussion should have alerted a reasonable attorney to the need for investigation "since Bigelow's

7

letters demonstrate that he had already developed a link between the two companies and his whereabouts on June 17th." *Id.* at 573-74. Merely discussing an issue of alibi - when it is the defendant's main defense - cannot alone rise to the level of reasonable representation. A lawyer who does only this cannot be deemed to have effectively represented his client. Here, Rost should have taken the additional steps of investigation, "*e.g.*, by contacting the initially-reluctant [Chasin] and confronting him with the new information about Greenlee, asking [Chasin] for records of the companies that helped with wedding preparations on the 17th, or talking to [Chasin's] neighbors . . . ." *Id.* Chasin's deposition testimony indicated that he would have readily been able to identify the Moonlighting workers by checking his "conveniently filed" records. Chasin Dep. at 12-13, 23. Again, the Circuit has asked this Court to evaluate whether "it was likely the three alibi witnesses would have been identified had [Rost] conducted a reasonable investigation." *Bigelow*, 367 F.3d at 576. This Court finds that there is a likelihood that the witnesses would have been identified.

For these reasons, this Court finds that no new evidence has risen to the level necessary to address the Circuit's well-founded concerns that Rost's failure to investigate the alibi defense after learning about Greenlee was constitutionally deficient.

### B. Prejudice prong of *Strickland*

The Circuit also noted that, on the record before it, Rost's deficient investigation could not be determined to have been non-prejudicial, but also that it would be up to this Court to evaluate that question at this juncture. *Bigelow*, 367 F.3d at 574. In the Circuit's analysis,

> the addition of the three Moonlighting witnesses would have presented the jury
> with (1) four witnesses on the one hand who could have identified Bigelow in court
> as the man they saw in Columbus on June 17th and (2) two witnesses on the other
> hand who could identify him in court as the assailant in one instance and as the
> man running from the crime scene in the other. In a case involving identification
> and identification alone, it is not easy to imagine a defense lawyer who would pass

8

> on the chance to bolster the defense with evidence of this sort – particularly since eyewitness evidence is "precisely the sort of evidence that an alibi defense refutes best."

*Id.* at 576 (citing *Griffin*, 970 F.2d at 1359).

The state advances evidence produced since remand that it estimates would cast significant doubt on whatever testimony the Moonlighting witnesses would be able to provide.  This is crucial because only evidence that has come to light since the 2004 remand by the Sixth Circuit can support the state's case.  The Circuit noted: "Nor, on this record, can one say that any errors in Rost's investigation were not prejudicial."  *Bigelow*, 367 F.3d at 574.  The Circuit concluded that the evidence on the record before the court "plainly would have bolstered Bigelow's defense and was anything but cumulative," and that "the testimony of the Moonlighting witnesses also would have facilitated Bigelow's efforts to undermine the State's case." *Id.* at 575.  In remanding the question of prejudice to this Court, then, the Circuit's opinion requires that this Court focus on evidence that was not on the record before the Circuit, but rather that has arisen after the remand.

After the 2004 remand, the state conducted depositions of Timler and Patridge in conjunction with a review of Moonlighting's business records, and an evidentiary hearing was held before the federal Magistrate on December 6, 2005.

The state argues that prejudice did not result from Rost's failure to investigate the Moonlighting witnesses because the evidentiary developments subsequent to remand establish contradictory, and thus unpersuasive, testimony by the Moonlighting witnesses.  According to the state, Partridge's testimony is suspect because it was not until after remand that she first testified that she saw Bigelow at Chasin's residence on all three days, and because Partridge's post-remand testimony that Timler was there for more than one day refutes Partridge and Timler's previous

9

testimony that Timler was there for one day.  (The state admits that Patridge never expressly

testified that Bigelow was there for *only* one day.  State's Br. at 17-18.)  Additionally, the state

argues Loyzelle's post-remand testimony does not help Bigelow's defense because Loyzelle was

unable to confirm his prior testimony that he was positive that he saw Bigelow on June 17.

It is not surprising that the testimony of all three witnesses did not remain completely

consistent over the course of the several years that have elapsed since they first testified.

Additionally, this inconsistency is neither as clearly established as the state portrays it to be nor

fatal to Bigelow's claim.  Post-remand, the state ties the facts of the case to two pages of

Moonlighting's business records, which apparently indicate that Timler was only at the Chasin

residence on June 16.  The witnesses agreed that their records tend to be accurate, but note that the

records offered by the state do not constitute the whole of Moonlighting's records.  Patridge even

stated in her deposition that her earlier testimony that Bigelow was there on June 17 was based on

additional documentation that was available at the time, but was not available at the time of the

post-remand deposition.  Patridge Dep. at 24.  The Circuit found other inconsistencies advanced

by the state to be "insignificant" because they did not "undermine the pivotal facts established by

the affidavits: that Patridge checked Moonlighting's records and verified that they were at

[Chasin's] on the 17th; that they saw Bigelow there both in the morning and in the afternoon; and

that [Chasin] had introduced Bigelow to Patridge and referred to him as 'Mike' within earshot of

Loyzelle."  *Id*. at 576.  Likewise, the inconsistencies advanced here by the state do not undermine

these pivotal facts, which would support Greenlee's testimony and Bigelow's alibi defense.  Most

importantly, Patridge maintained in her post-remand deposition that her prior testimony was based

on more business records than were available at the time of the post-remand deposition.

Inconsistencies in the currently available records, even if successfully established before a jury, would be weighed against the long passage of time and the prior consistent testimony that Patridge had replied to Bigelow's original letter because she checked the full business records at the time and concluded that Bigelow was in fact present at the Chasin residence when the underlying crime took place 150 miles away on June 17, 1993.

This Court must also consider the inconsistencies in testimony advocated by the state in light of the evidence that was used to convict the petitioner. *See Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."); *Clinkscale v. Carter*, 375 F.3d 430, 445 (6th Cir. 2004). The conviction in this case is not overwhelmingly supported by the record. The Circuit pointed out the weakness of the state's only evidence, namely, the identification of Bigelow by the victim and a witness, both of whom had limited opportunity to view the attacker and had at least initial difficulty identifying Bigelow. *Bigelow*, 367 F.3d at 575-76. However, these inconsistencies are not fatal to Bigelow's claims. Greelee was the only witness who testified to Bigelow's alibi defense. Even if only one more alibi witness had testified, it would have bolstered Greenlee's testimony and Bigelow's defense. *Clinkscale*, 375 F.3d at 445 ("Had even one alibi witness been permitted to testify on Clinkscale's behalf, Clinkscale's 'own testimony would have appeared more credible because it coincided in important respects with those of his alibi witness.'") (citing *Brown*, 137 F.3d at 1157). This is to say little of what balance may have been struck had all three Moonlighting witnesses been available to testify about June 17, 1993 and about their reactions to receiving Bigelow's letter of November 3, 1993. *See Bigelow*, 367 F.3d at 576. It is also notable that all three Moonlighting witnesses are completely disinterested in

11

Bigelow's case and have attended the various hearings and depositions at considerable expense. *Id.* at 575. Finally, the state has not advanced any new evidence that was not on the record before the Circuit that bolsters the underlying identification evidence, which the Circuit considered relatively weak.

## III. Conclusion

For the reasons enumerated herein, the Court finds that Rost acted unreasonably in failing to investigate the Orkin lead; that investigating the Orkin and Chasin leads would have probably led Rost to discover the Moonlighting witnesses; and that the absence of the Moonlighting witnesses prejudiced Bigelow's case such that the absence of the witnesses undermines confidence in the outcome of the trial.

Bigelow's petition for writ of habeas corpus is hereby GRANTED. The State of Ohio shall have one hundred and twenty (120) days in which to retry Bigelow or release him from state custody.

IT IS SO ORDERED.

        s/ *David A. Katz*
        DAVID A. KATZ
        U. S. DISTRICT JUDGE